1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   WILLIAM ASHFORD,

11              Petitioner,              No. CIV S-09-2703-FCD-TJB

12        vs.

13   STEVE MOORE,

14              Respondent.        ORDER, FINDINGS AND RECOMMENDATIONS

15   _____/

16                         I.  INTRODUCTION

17        Petitioner William Ashford is a state prisoner proceeding pro se with a petition for writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, (1) it is recommended

19   that habeas relief be denied; and (2) Petitioner's requests are denied.

20                      II.  PROCEDURAL HISTORY

21        On February 19, 1987, a jury convicted Petitioner of second degree murder and robbery in

22   the Alameda County Superior Court.  Resp't's Answer Ex. 1, pt. 1, at 2, ECF No. 13.  For second

23   degree murder, Petitioner was sentenced to fifteen years to life, with an additional two years for

24   personal use of a firearm.  *Id.*  For robbery, Petitioner was sentenced, consecutively, to three

25   years. *Id.* at 4.  In the instant action, Petitioner challenges the decision by the California Board of

26   Parole Hearings (the "Board") denying Petitioner parole.  Petitioner appeared before the Board

1

1   on June 20, 2008.

2          Petitioner filed a petition for writ of habeas corpus, dated November 22, 2008, with the

3   Alameda County Superior Court challenging the Board's decision.  *See* Resp't's Answer Ex. 2.

4   On May 26, 2009, the Superior Court issued a reasoned opinion denying the petition.  *See*

5   Resp't's Answer Ex. 3.  Petitioner sought relief in the California Court of Appeal, First Appellate

6   District, and the California Supreme Court; those petitions were likewise denied, but without

7   written opinions.  *See* Resp't's Answer Exs. 4-7.

8          On September 29, 2009, Petitioner filed a federal petition for writ of habeas corpus.

9   Petitioner amended the petition on October 20, 2009.  Respondent filed an answer to the petition

10  on December 8, 2009, to which Petitioner filed a traverse on December 17, 2009.

11                                    III.  FACTUAL BACKGROUND

12         On August 31st, 1985, [Petitioner] and his friend, Debbie
       Therman, . . . and her young daughter went to the Parkway Theater
13     to see a movie.  During the movie [Petitioner] was approached by
       ushers regarding his use of alcohol in the theater.  Each time
14     [Petitioner] gave an angry response.  After the movie [Petitioner]
       saw Leslie Martin[] . . . in front of the theater and mistakenly
15     thought Martin was one of the ushers who had approached him.
       [Petitioner] put his finger in Martin's face and angrily accused him
16     of taking his drink.  Martin moved [Petitioner's] finger out of his
       face.  [Petitioner] said, "I've got something for you."  [Petitioner]
17     pulled out a 25-caliber hand gun and shot Martin one time in the
       heart.  Martin died almost instantly.  [Petitioner] was asked about
18     the shooting later that night.  He responded by saying matter-of-
       factly, "It was his time to go."  [Petitioner] subsequently cut his
19     hair, changed his hair style and changed his residence.

20         . . . .

21         After [Petitioner] shot Leslie Martin, he immediately ran up East
       19th Street where he saw David Thomas holding a 10-speed
22     bicycle.  [Petitioner] approached Thomas and angrily said, "Give
       me the mother fucking bike."  Thomas refused, at which time
23     [Petitioner] displayed his gun, demanding the bike.  Thomas gave
       the bike to [Petitioner], who then rode away.  [Petitioner] later
24     bragged about taking a guy's bicycle to make his getaway.

25  Resp't's Answer Ex. 1, pt. 2, at 3-6; Parole Hr'g Tr. 13-16, June 20, 2008.

26         Prior to incarceration, Petitioner completed up to the eleventh grade, when he was

                                                2

1   expelled.  Resp't's Answer Ex. 1, pt. 2, at 13; Parole Hr'g Tr. 23.  Petitioner explained his

2   expulsion was for not attending class.  Resp't's Answer Ex. 1, pt. 2, at 13; Parole Hr'g Tr. 23.  At

3   age sixteen or seventeen, Petitioner "started using drugs," including "crack cocaine," and

4   "drinking alcoholic beverages."  Resp't's Answer Ex. 1, pt. 2, at 14; Parole Hr'g Tr. 24.  When

5   Petitioner committed the commitment offense, Petitioner was "twenty-four, 23," unemployed,

6   and "living with [his] brother."  Resp't's Answer Ex. 1, pt. 2, at 14, 40; Parole Hr'g Tr. 24, 50.

7   IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

8       An application for writ of habeas corpus by a person in custody under judgment of a state

9   court can be granted only for violations of the Constitution or laws of the United States.  28

10  U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v.*

11  *Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

12  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to,

13  the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521

14  U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999).  Under

15  AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

16  state court proceedings unless the state court's adjudication of the claim:

17              (1) resulted in a decision that was contrary to, or involved an
                unreasonable application of, clearly established Federal law, as
18              determined by the Supreme Court of the United States; or

19              (2) resulted in a decision that was based on an unreasonable
                determination of the facts in light of the evidence presented in the
20              State court proceeding.

21  28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v.*

22  *Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

23      In applying AEDPA's standards, the federal court must "identify the state court decision

24  that is appropriate for our review."  *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

25  Where more than one state court has adjudicated a petitioner's claims, a federal habeas court

26  analyzes the last reasoned decision.  *Id.* (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)

1  (finding presumption that later unexplained orders, upholding judgment or rejecting same claim,

2  rests upon same ground as prior order)).   Thus, a federal habeas court looks through ambiguous

3  or unexplained state court decisions to the last reasoned decision to determine whether that

4  decision was contrary to, or an unreasonable application of, clearly established federal law.

5  *Bailey v. Rae,* 339 F.3d 1107, 1112-13 (9th Cir. 2003).   "The question under AEDPA is not

6  whether a federal court believes the state court's determination was incorrect but whether that

7  determination was unreasonable--a substantially higher threshold."   *Schriro v. Landrigan*, 550

8  U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

## V.  REQUESTS FOR REVIEW

10       The petition for writ of habeas corpus sets forth three requests.   Specifically, Petitioner

11  requests:  (1) an order to show cause; (2) appointment of counsel; and (3) an evidentiary hearing.

12  Pet'r's Am. Pet. 14, ECF. No. 9.

13       A.  First Request:  Order To Show Cause

14       First, Petitioner requests that "this Court Order a Formal Show Cause [sic]."   *Id.*   As

15  stated earlier, Respondent filed an answer to the petition on December 8, 2009, to which

16  Petitioner filed a traverse on December 17, 2009.   Petitioner's request for an order to show cause

17  is denied as moot.

18       B.  Second Request:  Appoint Counsel

19       Second, Petitioner requests appointment of counsel in further litigation of this action.   *Id.*

20  The Sixth Amendment right to counsel does not apply in habeas corpus actions.   *See Knaubert v.*

21  *Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986).   A district court, however, may appoint counsel to

22  represent a habeas petitioner whenever "the court determines that the interests of justice so

23  require," and such person is financially unable to obtain representation.   18 U.S.C. §

24  3006A(a)(2)(B).   The decision to appoint counsel is within the district court's discretion.   *See*

25  *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986).   Courts have made appointment of

26  counsel the exception rather than the rule by limiting it to:  (1) capital cases; (2) cases that turn

4

1  on substantial and complex procedural, legal, or mixed legal and factual questions; (3) cases

2  involving uneducated or mentally or physically impaired petitioners; (4) cases likely to require

3  the assistance of experts either in framing or in trying the claims; (5) cases in which the petitioner

4  is in no position to investigate crucial facts; and (6) factually complex cases. *See generally* 1 J.

5  LIEBMAN & R. HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE § 12.3b, at 383-86

6  (2d ed. 1994).  Appointment is mandatory only when the circumstances of a particular case

7  indicate that appointed counsel is necessary to prevent due process violations.  *See Chaney*, 801

8  F.2d at 1196; *Eskridge v. Rhay*, 345 F.2d 778, 782 (9th Cir. 1965).

9       Appointment of counsel is not warranted in this case.  Petitioner's claims are typical

10  claims arising in habeas petitions and are not especially complex.  This is not an exceptional case

11  warranting representation on federal habeas review.  Petitioner's request for appointment of

12  counsel is denied.

13       C.  Third Request:  Evidentiary Hearing

14       Third, Petitioner requests an evidentiary hearing.  Pet'r's Am. Pet. 14.  Under 28 U.S.C. §

15  2254(e)(2), a district court presented with a request for an evidentiary hearing must first

16  determine whether a factual basis exists in the record to support a petitioner's claims and, if not,

17  whether an evidentiary hearing "might be appropriate."  *Baja v. Ducharme*, 187 F.3d 1075, 1078

18  (9th Cir. 1999); *see also Earp v. Ornoski*, 431 F.3d 1158, 1166 (9th Cir. 2005); *Insyxiengmay v.*

19  *Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005).  "[W]here the petitioner establishes a colorable

20  claim for relief and has never been afforded a state or federal hearing on this claim, we must

21  remand to the district court for an evidentiary hearing."  *Earp*, 431 F.3d at 1167 (citing

22  *Insyxiengmay*, 403 F.3d at 670; *Stankewitz v. Woodford*, 365 F.3d 706, 708 (9th Cir. 2004);

23  *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001)).  In other words, a hearing is required if:

24  "(1) [the petitioner] has alleged facts that, if proven, would entitle him to habeas relief, and (2) he

25  did not receive a full and fair opportunity to develop those facts[.]"  *Williams v. Woodford*, 384

26  F.3d 567, 586 (9th Cir. 2004).

1    Here, Petitioner's request does not establish that these requirements are satisfied such that

2    an evidentiary hearing would be appropriate.  Petitioner does not allege facts that establish a

3    colorable claim for relief because the Board's parole denial is supported by "some evidence"

4    demonstrating future dangerousness, and the Superior Court's decision is reasonable.  *See infra*

5    Part VI.  Petitioner's request for an evidentiary hearing is denied.

6    This matter is now ready for decision.  For the following reasons, it is recommended that

7    habeas relief be denied.

8    VI.  CLAIMS FOR REVIEW

9    The petition for writ of habeas corpus sets forth two grounds for relief, both of which are

10    due process claims.  First, Petitioner argues that "the Board . . . [f]ailed to follow [] the laws"

11    because "the Board failed to present any evidence that supports a denial of parole."  Pet'r's Am.

12    Pet. 5.  Second, Petitioner contends "[t]he [s]tate [c]ourt [d]ecision (last reasoned) was

13    unreasonable in light of the facts . . . ."  *Id.* at 4.

14    A.  Legal Standard for Parole Denial

15    The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives

16    a person of life, liberty, or property without due process of law.  A person alleging a due process

17    violation must first demonstrate that he or she was deprived of a protected liberty or property

18    interest, and then show that the procedures attendant upon the deprivation were not

19    constitutionally sufficient.  *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 459-60 (1989);

20    *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).

21    1.  Liberty Interest in Parole

22    A protected liberty interest may arise from either the Due Process Clause itself or from

23    state laws.  *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United States Constitution

24    does not, in and of itself, create for prisoners a protected liberty interest in the receipt of a parole

25    date.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  The full panoply of rights afforded a

26    defendant in a criminal proceeding is not constitutionally mandated in the context of a parole

6

1   proceeding.  *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987).  The Supreme

2   Court has held that a parole board's procedures are constitutionally adequate if the inmate is

3   given an opportunity to be heard and a decision informing him of the reasons he did not qualify

4   for parole.  *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 16 (1979).  If a

5   state's statutory parole scheme uses mandatory language, however, it "'creates a presumption that

6   parole release will be granted' when or unless certain designated findings are made," thereby

7   giving rise to a constitutional liberty interest.  *McQuillion*, 306 F.3d at 901 (quoting *Greenholtz*,

8   442 U.S. at 12).

9        Section 3041 of the California Penal Code sets forth the state's legislative standards for

10   determining parole for life-sentenced prisoners.  Subsection (a) provides that "[o]ne year prior to

11   the inmate's minimum eligible parole release date a panel . . . shall again meet with the inmate

12   and shall normally set a parole release date . . . ."  Subsection (b) provides an exception to the

13   regular and early setting of a life-sentenced individual's term, if the Board determines "that the

14   gravity of the current convicted offense or offenses, or the timing and gravity of current or past

15   convicted offense or offenses, is such that consideration of the public safety requires a more

16   lengthy period of incarceration . . . ."  Based on this statute, California state prisoners who have

17   been sentenced to prison with the possibility of parole have a clearly established, constitutionally

18   protected liberty interest in receipt of a parole release date.  *Allen*, 482 U.S. at 377-78 (quoting

19   *Greenholtz*, 442 U.S. at 12); *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing *Sass v.*

20   *Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910,

21   914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903.

22                  2.  Scope of Due Process Protection

23        Additionally, as a matter of California state law, denial of parole to state inmates must be

24   supported by at least "some evidence" demonstrating future dangerousness.  *Hayward v.*

25   *Marshall*, 603 F.3d 546, 562-63 (9th Cir. 2010) (en banc) (citing *In re Lawrence*, 44 Cal. 4th

26   1181, 82 Cal. Rptr. 3d 169, 190 P.3d 535 (2008); *In re Shaputis*, 44 Cal. 4th 1241, 82 Cal. Rptr.

3d 213, 190 P.3d 573 (2008); *In re Rosenkrantz*, 29 Cal. 4th 616, 128 Cal. Rptr. 2d 104, 59 P.3d 174 (2002)).  California's "some evidence" requirement is a component of the liberty interest created by the state's parole system.  *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010).  The federal Due Process Clause requires, in turn, that California comply with its own "some evidence" requirement.  *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010) (per curiam). Thus, a reviewing court such as this one must "decide whether the California judicial decision approving the . . . decision rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'"  *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

The analysis of whether some evidence supports the denial of parole to a California state inmate is framed by the state's statutes and regulations governing parole suitability determinations.  *See Irons*, 505 F.3d at 851.  A reviewing court "must look to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by 'some evidence' [] constituted an unreasonable application of the 'some evidence' principle."  *Id*.

### 3.  California's Parole Scheme

Title 15, section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers.  "All relevant, reliable information available to the [Board] shall be considered in determining suitability for parole." CAL. CODE REGS. tit. 15, § 2402(b).  This includes:

> [T]he circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

8

1  *Id.*  The regulation also lists specific circumstances which tend to show suitability or unsuitability

2  for parole.  *Id.* § 2402(c)-(d).

3        Under section 2402(c)(1), factors relating to a commitment offense tend to show

4  unsuitability for parole where (A) multiple victims were attacked, injured or killed; (B) the

5  offense was carried out in a dispassionate and calculated manner, such as an execution-style

6  murder; (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a

7  manner which demonstrates an exceptionally callous disregard for human suffering; or (E) the

8  motive for the crime is inexplicable or very trivial in relation to the offense.  *Id.* § 2402(c)(1)(A)-

9  (E).

10        Other circumstances tending to indicate unsuitability include:

11            (2) Previous Record of Violence.  The prisoner on previous
             occasions inflicted or attempted to inflict serious injury on a
12            victim, particularly if the prisoner demonstrated serious assaultive
             behavior at an early age.
13
             (3) Unstable Social History.  The prisoner has a history of unstable
14            or tumultuous relationships with others.

15            (4) Sadistic Sexual Offenses.  The prisoner has previously sexually
             assaulted another in a manner calculated to inflict unusual pain or
16            fear upon the victim.

17            (5) Psychological Factors.  The prisoner has a lengthy history of
             severe mental problems related to the offense.
18
             (6) Institutional Behavior.  The prisoner has engaged in serious
19            misconduct in prison or jail.

20  *Id.* § 2402(c)(2)-(6).

21        Section 2402(d) sets forth circumstances tending to show suitability, which include:

22            (1) No Juvenile Record.  The prisoner does not have a record of
             assaulting others as a juvenile or committing crimes with a
23            potential of personal harm to victims.

24            (2) Stable Social History.  The prisoner has experienced reasonably
             stable relationships with others.
25
             (3) Signs of Remorse.  The prisoner performed acts which tend to
26            indicate the presence of remorse, such as attempting to repair the

9

1   damage, seeking help for or relieving suffering of the victim, or the
prisoner has given indications that he understands the nature and
2   magnitude of the offense.

3   (4) Motivation for Crime.  The prisoner committed his crime as the
result of significant stress in his life, especially if the stress had
4   built over a long period of time.

5   (5) Battered Woman Syndrome.  At the time of the commission of
the crime, the prisoner suffered from Battered Woman Syndrome,
6   as defined in section 2000(b), and it appears the criminal behavior
was the result of that victimization.

7
(6) Lack of Criminal History.  The prisoner lacks any significant
8   history of violent crime.

9   (7) Age.  The prisoner's present age reduces the probability of
recidivism.
10
(8) Understanding and Plans for Future.  The prisoner has made
11   realistic plans for release or has developed marketable skills that
can be put to use upon release.
12
(9) Institutional Behavior.  Institutional activities indicate an
13   enhanced ability to function within the law upon release.

14   *Id.* § 2402(d)(1)-(9).

15   The overriding concern is public safety and the focus is on the inmate's *current*

16   dangerousness.  *In re Lawrence*, 44 Cal. 4th at 1205, 82 Cal. Rptr. 3d 169, 190 P.3d 535.  Thus,

17   the proper articulation of the standard of review is not whether some evidence supports the stated

18   reasons for denying parole, but whether some evidence indicates that the inmate's release would

19   unreasonably endanger public safety.  *In re Shaputis*, 44 Cal. 4th at 1254, 82 Cal. Rptr. 3d 213,

20   190 P.3d 573.  There must be a rational nexus between the facts relied upon and the ultimate

21   conclusion that the prisoner continues to be a threat to public safety.  *In re Lawrence*, 44 Cal. 4th

22   at 1227, 82 Cal. Rptr. 3d 169, 190 P.3d 535.

23   B.  State Court Decision

24   Here, because the California Supreme Court and California Court of Appeal summarily

25   denied the petition, the state court decision appropriate for review is the Superior Court's

26   decision.  Under AEDPA's standards, the Superior Court reasonably held that "some evidence"

10

1   showed Petitioner "currently poses an unreasonable risk of danger to society if released . . . ."

2   *See* Resp't's Answer Ex. 3, at 5.  The Superior Court considered Petitioner's (1) commitment

3   offense; (2) prior criminal and social history; (3) institutional disciplinary record; (4)

4   psychological assessment; and (5) lack of parole plans.  *Id.*

5            1.  Commitment Offense

6            First, the Superior Court properly noted that the Board considered Petitioner's

7   commitment offense, among other factors, when denying parole.  *Id.*  The Board read into the

8   record the summary of Petitioner's commitment offense, taken from the June 2008 Board Report,

9   "which refers back to the June 2006 Board Report for the summary."  Resp't's Answer Ex. 1, pt.

10  2, at 3; Parole Hr'g Tr. 13; *see supra* Part III.  At the hearing and in summary, the Board

11  explained its reliance, in part, on Petitioner's offense as follows:

12              The first consideration that gives great weight in this case towards
                unsuitability is the commitment offense. . . . [Petitioner] did
13              commit this offense in a cruel manner . . . which demonstrates an
                exceptionally callous disregard for human life and suffering. . . .
14              Mr. Martin . . . was shot to death by [Petitioner] outside of a movie
                theater and . . . this particular victim was mistaken for another
15              individual who had evidently taken [Petitioner's] alcohol or [his]
                drink at this particular movie theater. [Petitioner was] under the
16              influence at the time and reacted in a very angry manner and,
                again, confronted Mr. Martin, pulling out a weapon and shooting
17              him in the heart and killing him instantly.  We note . . . that this
                was a public area, as well, and there were other people . . . that
18              were obviously present[,] and . . . the potential of others being
                injured and killed . . . was very high and it's . . . fortunate that that
19              did not occur.  We note that the motive obviously is very trivial in
                relation to this offense and that this particular young man who had
20              his life in front of him, 18 years old, was shot for no reason at all,
                and that certainly is very callous and essentially a very disregard
21              for this man.

22              . . . .

23              [Petitioner] did not even bother to stay and render aid or any
                assistance whatsoever for the victim, but instead fled.  On the way,
24              as he fled, he then encountered another victim and proceeded to
                steal his bicycle, a 10-speed bicycle.  This particular victim initially
25              had refused to give the bicycle[.] [W]hen that occurred, [Petitioner]
                then angrily, . . . pointing the weapon at him, demanded that he
26              give him the bike and then, . . . the victim did hand over the bicycle

                                              11

1
2
3
4
5

> and . . . was not harmed, but . . . there was a potential there for this
> particular victim . . . [to] be[] injured or killed by [Petitioner]. . . .
> [W]e note that the murder of this particular victim, Mr. Martin,
> certainly did not deter [Petitioner] from later committing this
> additional crime; that of robbery.  We also note that [Petitioner],
> after the commission of this crime, took some measures to change
> his appearance by cutting his hair and changing his hairstyle and
> actually changing residence, . . . but . . . to no avail, because he was
> later apprehended.

6   Resp't's Answer Ex. 1, pt. 2, at 54-57, 64; Parole Hr'g Tr. 64-67, 74.

7        At the hearing, Petitioner's counsel asserted that Petitioner would speak about

8   "[e]verything but the commitment offense."  Resp't's Answer Ex. 1, pt. 2, at 2; Parole Hr'g Tr.

9   12.  The Board then read Petitioner's version into the record:

10
11
12
13
14
15
16

> [Petitioner] stated the official version of the life crime is essentially
> accurate.  The incident that led to the shooting was, in essence, a
> disagreement with the theater staff.  When confronted outside the
> theater by the usher, [Petitioner] felt somewhat threatened by the
> situation and acted impulsively.  He was under the influence of
> alcohol and cocaine.  [Petitioner] explained the reason for being
> armed was due to [an] ongoing disagreement with a neighbor.  He
> was truly in fear for his and his family's safety during the previous
> several weeks and expressed a commitment to a drug free and
> sober lifestyle.  [Petitioner] acknowledges the pain and tragedy that
> the victim's family must have felt.  He accepts complete
> responsibility for his actions and regrets taking the life of Leslie
> Martin.

17   Resp't's Answer Ex. 1, pt. 2, at 4-5; Parole Hr'g Tr. 14-15.

18        When the Board asked Petitioner if he had any comments regarding his version of the

19   statement, Petitioner replied, "No, sir."  Resp't's Answer Ex. 1, pt. 2, at 5-6; Parole Hr'g Tr. 15-

20   16.  The Board recognized Petitioner was "not speaking of the crime," but also asked, "What's

21   the definition of remorse?"  Resp't's Answer Ex. 1, pt. 2, at 45; Parole Hr'g Tr. 55.  Petitioner

22   answered, "To feel bad about something. . . . You try to make amends. . . . I don't want to [b]e

23   this individual that committed this crime.  I don't, you know, it's a shameful thing, it's a painful

24   thing."  Resp't's Answer Ex. 1, pt. 2, at 45; Parole Hr'g Tr. 55.

25        The Board then questioned Petitioner about step eight in the twelve-step program, i.e.,

26   making amends.  Resp't's Answer Ex. 1, pt. 2, at 45-46; Parole Hr'g Tr. 55-56.  Petitioner

replied, "I made a written list of the people I harmed."  Resp't's Answer Ex. 1, pt. 2, at 46; Parole Hr'g Tr. 56.  Petitioner elaborated, "I have apologized to people, the ones I've been able to contact, such as my ex-wife or my mother . . . ."  Resp't's Answer Ex. 1, pt. 2, at 46; Parole Hr'g Tr. 56.  At the top of Petitioner's list, he claimed, was the victim of the commitment offense.  Resp't's Answer Ex. 1, pt. 2, at 47; Parole Hr'g Tr. 57.

Petitioner reiterated that he took "full responsibility for the crime."  Resp't's Answer Ex. 1, pt. 2, at 47; Parole Hr'g Tr. 57.  When the Board asked "[i]n what way," Petitioner replied, "I shot a man, I'm being punished for it.  I'm trying to change myself . . . into a better human being."  Resp't's Answer Ex. 1, pt. 2, at 47; Parole Hr'g Tr. 57.  The Board then questioned whether Petitioner felt he had "done a good job . . . of trying to change [him]self."  Resp't's Answer Ex. 1, pt. 2, at 48; Parole Hr'g Tr. 58.  Petitioner replied, "I was thinking, . . . [a]m I trying to be perfect? . . . Because I'm going to fail. . . .  But, I'm trying to change and I'm trying to do the right thing."  Resp't's Answer Ex. 1, pt. 2, at 48; Parole Hr'g Tr. 58.

The psychological report revealed Petitioner "lacks insight into the causes for his life crime . . . ."  Resp't's Answer Ex. 1, pt. 2, at 61; Parole Hr'g Tr. 71.  The report explained that Petitioner "lacks insight into his personality structure and his vulnerability to aggressive outbursts[,]" and "[i]t is in this area that he lacks insight into the causes of his life crime."  Resp't's Answer Ex. 1, pt. 2, at 61; Parole Hr'g Tr. 71; *see infra* Part VI.B.4.  Thus, the Superior Court properly found that the Board weighed the nature and gravity of Petitioner's commitment offense, and "noted the nexus between . . . Petitioner's commitment offense and his disciplinary history."  Resp't's Answer Ex. 3, at 4; *see infra* Part VI.B.3.

### 2.  Prior Criminal and Social History

Second, the Superior Court appropriately noted that the Board examined Petitioner's "escalating pattern of criminal conduct" and "unstable social history."  Resp't's Answer Ex. 1, pt. 2, at 57; Parole Hr'g Tr. 67.  The Board stated:

> [W]e move on to your criminal history and . . . we note that you

1    have an adult criminal history prior to the commitment offense.
     We note that you do not have a juvenile record at this time.  But, it
2    certainly does weigh heavily against suitability.  [T]hat does
     include assaulting others and . . . there was a conviction of battery.
3    You certainly have an escalating pattern of criminal conduct and of
     violence that does include possession of controlled substance, the
4    battery, selling and furnishing marijuana and hashish.  You also
     have an unstable social history and . . . a history of unstable and
5    tumultuous relationships with others. . . . [T]here is substance
     abuse, that you involved yourself of crack cocaine and alcohol.
6    You dropped out of high school. . . . We do note that your social
     history was so unstable that you did fail to profit from society's
7    attempts to correct your criminality through adult probation and
     county jail[.] . . . [A]t times[,] . . . you were supporting yourself by
8    selling drugs . . . .

9    Resp't's Answer Ex. 1, pt. 2, at 57-58; Parole Hr'g Tr. 67-68.

10         Specifically, Petitioner "grew up at periods with [his] mother and father."  Resp't's

11   Answer Ex. 1, pt. 2, at 11; Parole Hr'g Tr. 21.  Mostly, he "was raised by [his] grandmother."

12   Resp't's Answer Ex. 1, pt. 2, at 11; Parole Hr'g Tr. 21.  Petitioner's grandmother "had like seven

13   or eight kids running around," and "[i]t was too much for her."  Resp't's Answer Ex. 1, pt. 2, at

14   12; Parole Hr'g Tr. 22.  Petitioner was "placed at the Hannah Boy's Center for four years."

15   Resp't's Answer Ex. 1, pt. 2, at 12; Parole Hr'g Tr. 22.  In total, Petitioner had five brothers and

16   one sister.  Resp't's Answer Ex. 1, pt. 2, at 10; Parole Hr'g Tr. 20.  Petitioner also had two

17   daughters who were twenty-six and twenty-three years old at the time of hearing.  Resp't's

18   Answer Ex. 1, pt. 2, at 16; Parole Hr'g Tr. 26.

19         At the time of the hearing, both of Petitioner's parents were deceased.  Resp't's Answer

20   Ex. 1, pt. 2, at 10; Parole Hr'g Tr. 20.  Petitioner stated he corresponded with one of his brothers,

21   and "the rest of them, you know, they [were] in and out of the system . . . ."  Resp't's Answer Ex.

22   1, pt. 2, at 10; Parole Hr'g Tr. 20.  Petitioner's sister was "born of another mother," so he "never

23   really . . . knew her."  Resp't's Answer Ex. 1, pt. 2, at 11; Parole Hr'g Tr. 21.  Petitioner

24   explained his daughters were "pretty much raised away from [him]" once he was incarcerated.

25   Resp't's Answer Ex. 1, pt. 2, at 16; Parole Hr'g Tr. 26.  Petitioner was also divorced.  Resp't's

26   Answer Ex. 1, pt. 2, at 16; Parole Hr'g Tr. 26.

1      When rendering its decision, the Board noted Petitioner had "somewhat of a

2  dysfunctional family," and that was "something there that you were not able to control."  Resp't's

3  Answer Ex. 1, pt. 2, at 57-58; Parole Hr'g Tr. 67-68.  The Board acknowledged "that was just a

4  situation in your childhood."  Resp't's Answer Ex. 1, pt. 2, at 58; Parole Hr'g Tr. 68.  However,

5  the Board considered Petitioner's social history because it was "so unstable that you did fail to

6  profit from society's attempts to correct your criminality through adult probation and county

7  jail[.] . . . [A]t times[,] . . . you were supporting yourself by selling drugs . . . ."  Resp't's Answer

8  Ex. 1, pt. 2, at 58; Parole Hr'g Tr. 68.

9      The Board also reviewed Petitioner's prior criminal history.  In August 1980, Petitioner

10  had "an arrest by Richmond PD for assault with a deadly weapon.  That was rejected by the

11  District Attorney's office."  Resp't's Answer Ex. 1, pt. 2, at 7; Parole Hr'g Tr. 17.  In April 1981,

12  Petitioner was arrested by the "Emeryville PD for disturbing the peace, malicious mischief, [and]

13  vandalism, [which was] rejected by the District Attorney's office."  Resp't's Answer Ex. 1, pt. 2,

14  at 7; Parole Hr'g Tr. 17.  In August 1981, Petitioner was arrested by the "Oakland PD for

15  possession of narcotic controlled substance for sale, [which was] rejected by the District

16  Attorney's office."  Resp't's Answer Ex. 1, pt. 2, at 7; Parole Hr'g Tr. 17.  Petitioner was then

17  "arrested for possession of a controlled substance and [he] did receive a conviction and . . . [was]

18  granted 18 months court probation."[1]  Resp't's Answer Ex. 1, pt. 2, at 7; Parole Hr'g Tr. 17.  In

19  October 1981, Petitioner was arrested by the "Oakland PD for possession of marijuana, hashish

20  for sale and possession of a controlled substance.  Once again, there was a reject."  Resp't's

21  Answer Ex. 1, pt. 2, at 7; Parole Hr'g Tr. 17.

22      In January 1985, Petitioner was arrested by the "Oakland PD [for] . . . battery and

23  vandalism."  Resp't's Answer Ex. 1, pt. 2, at 7-8; Parole Hr'g Tr. 17-18.  Since the "[d]isposition

24  [wa]s unknown," the Board asked Petitioner to explain what happened.  Resp't's Answer Ex. 1,

25

26         [1] The record does not provide when and where this arrest and conviction occurred.

15

pt. 2, at 8; Parole Hr'g Tr. 18.  To Petitioner's knowledge, "it was dismissed."  Resp't's Answer Ex. 1, pt. 2, at 8; Parole Hr'g Tr. 18.  Petitioner explained, "[M]e and my cousin had got into a[n] argument, right?  And a window got broke."  Resp't's Answer Ex. 1, pt. 2, at 9; Parole Hr'g Tr. 19.

In February 1985, Petitioner was arrested and convicted of battery.  Resp't's Answer Ex. 1, pt. 2, at 9; Parole Hr'g Tr. 19.  In March 1985, Petitioner was arrested for battery again, "and that was rejected."  Resp't's Answer Ex. 1, pt. 2, at 9; Parole Hr'g Tr. 19.  In August 1985, Petitioner had "another arrest for selling, furnishing marijuana, hashish, possession of marijuana, hashish for sale, and both charges were dismissed due to [a] plea to other unknown charges." Resp't's Answer Ex. 1, pt. 2, at 9; Parole Hr'g Tr. 19.  When asked about the plea, Petitioner responded, "I couldn't tell you what that -- that's been a long time."  Resp't's Answer Ex. 1, pt. 2, at 9; Parole Hr'g Tr. 19.  The Superior Court, therefore, reasonably found that the Board appropriately considered Petitioner's prior criminal and social history.

### 3. Institutional Disciplinary Record

Third, the Superior Court properly determined that the Board reviewed Petitioner's institutional disciplinary record.  *See* Resp't's Answer Ex. 3, at 5.  At the time of the hearing, Petitioner had eight 128 violations, the most recent being in March 2002, when Petitioner used "a forklift where supposedly [he] didn't have permission."  Resp't's Answer Ex. 1, pt. 2, at 30; Parole Hr'g Tr. 40.  Petitioner explained:

> [W]hen I first got in that shop, we all used to just get on the forklift. . . . So I just did what I thought everybody else was doing. . . . What happened was that I got confused on whether the break should be up or down . . . and it just went down into the door.  We fixed it within a[n] hour, but they felt like it should go in my file.

Resp't's Answer Ex. 1, pt. 2, at 32; Parole Hr'g Tr. 42.  "[A]fter that period[,] [Petitioner] even worked [his] way up to lead man."  Resp't's Answer Ex. 1, pt. 2, at 32; Parole Hr'g Tr. 42.  The Board asked about this incident because it "wanted to make sure it was clear that it wasn't like using the forklift in a negative way or something."  Resp't's Answer Ex. 1, pt. 2, at 31; Parole

1    Hr'g Tr. 41.

2    　　At the time of the hearing, Petitioner also had six 115 violations.  Resp't's Answer Ex. 1,

3    pt. 2, at 32; Parole Hr'g Tr. 42.  Petitioner had violations for:  (1) unlawful influence in 1988; (2)

4    failure to perform as directed in 1989; (3) verbal disrespect in 1989; (4) involvement in a group

5    altercation in 1994; (5) "mutual combat with serious injury" in October 2000; and (6) "behavior

6    which could result in violence" on January 17, 2007.  Resp't's Answer Ex. 1, pt. 2, at 32-33;

7    Parole Hr'g Tr. 42-43.  For Petitioner's October 2000 violation, Petitioner "pled guilty to that."

8    Resp't's Answer Ex. 1, pt. 2, at 33; Parole Hr'g Tr. 43.

9    　　The Board emphasized that Petitioner's "'07 violation is really problematic."  Resp't's

10   Answer Ex. 1, pt. 2, at 34; Parole Hr'g Tr. 44.  Petitioner "was found guilty of it and it was

11   reduced to an administrative."  Resp't's Answer Ex. 1, pt. 2, at 32-33; Parole Hr'g Tr. 42-43.  In

12   this incident, Petitioner "[m]ade a comment, left, came back and made another comment to the

13   staff member."  Resp't's Answer Ex. 1, pt. 2, at 33; Parole Hr'g Tr. 43.

14   　　　　　The first [comment] was, "You better check your boy," and then
           [Petitioner] left and came back and said, "I don't know what kind
15   　　　　　of game you and that bitch ass nigga's playing, but it is going to
           cause someone to get hurt."
16

17   Resp't's Answer Ex. 1, pt. 2, at 33; Parole Hr'g Tr. 43.  The Board acknowledged, "It was not

18   violence itself," but "you look back historically and you see altercations and disrespect and you

19   see" the 2007 violation, "which is very recent, . . . just a little over a year ago."  Resp't's Answer

20   Ex. 1, pt. 2, at 32, 34; Parole Hr'g Tr. 42, 44.  The Superior Court, therefore, properly found that

21   the Board weighed Petitioner's institutional disciplinary record against Petitioner.

22   　　　　　　　　4.  Psychological Assessment

23   　　Fourth, the Superior Court appropriately maintained that the Board factored in

24   Petitioner's psychological report.  *See* Resp't's Answer Ex. 3, at 5.  The reported assessed

25   Petitioner's "overall risk for re-offense [a]s moderate."  Resp't's Answer Ex. 1, pt. 2, at 35;

26   Parole Hr'g Tr. 45.  The assessment also noted Petitioner had a "personality disorder with

17

1  antisocial and narcissistic traits." Resp't's Answer Ex. 1, pt. 2, at 36; Parole Hr'g Tr. 46.  When

2  rending its decision, the Board read an excerpt from the psychological report:

3          [Petitioner] displayed some of the predictive factors for recidivism.
   He lacks insight into his personality structure and his vulnerability

4          to aggressive outbursts when he feels challenged or not recognized
   as someone of worth.  It is in this area that he lacks insight into the

5          causes of his life crime, as well as the more recent 115, although he
   is generally stable as witnessed by his primarily satisfactory to

6          exceptional ratings at work.  He remains vulnerable to impulsivity
   and certain kinds of situations such as just noted where he feels

7          overwhelmed by negative emotions.  This suggests that he still
   lacks some insight into his problems with emotional control.

8          Although he has some negative attitude toward the parole process
   he has been very responsive to [Board] recommendations in recent

9          years.

10  Resp't's Answer Ex. 1, pt. 2, at 36; Parole Hr'g Tr. 46.

11       The psychological evaluator recognized Petitioner completed anger management,[2] but the

12  Board recounted "there seems to be an issue there in reference to . . . [is Petitioner] internalizing

13  that.  [Is Petitioner] getting it? . . . [Is Petitioner] pulling from that and having a good

14  understanding and adapting this to what [his] problems are."  Resp't's Answer Ex. 1, pt. 2, at 36;

15  Parole Hr'g Tr. 46.  Thus, the Superior Court reasonably held that the Board factored in

16  Petitioner's psychological report when denying parole.

17  ///

18   

19      [2] When rendering its decision, the Board found Petitioner's self-help programming "[wa]s
   somewhat of a mixed bag."  Resp't's Answer Ex. 1, pt. 2, at 58; Parole Hr'g Tr. 68.  In 1991,
   Petitioner started participating in Narcotics Anonymous (NA), and at the hearing, Petitioner

20  continued to participate in it.  Resp't's Answer Ex. 1, pt. 2, at 28; Parole Hr'g Tr. 38.  Petitioner
   admitted, however, he stopped attending NA for "a couple months or something," after he

21  received one of his 115 violations, because he "got kind of down."  Resp't's Answer Ex. 1, pt. 2,
   at 28; Parole Hr'g Tr. 38.  On May 16, 2006, Petitioner was suspended from the Straight Life

22  Program for passing his correspondence information to a program participant, Resp't's Answer
   Ex. 1, pt. 2, at 21; Parole Hr'g Tr. 31, but at the time of the hearing "[h]e started that again."

23  Resp't's Answer Ex. 1, pt. 2, at 27; Parole Hr'g Tr. 37.  In July 2006, Petitioner received a
   certificate for completing an anger management course.  Resp't's Answer Ex. 1, pt. 2, at 20;

24  Parole Hr'g Tr. 30.  In August 2006, Petitioner received a certificate for completing a stress
   management course.  Resp't's Answer Ex. 1, pt. 2, at 20-21; Parole Hr'g Tr. 30-31.  The Board

25  concluded, "While you have participated in self-help groups while incarcerated, you have not
   internalized what you have learned," as Petitioner's most recent 115 violation demonstrated.

26  Resp't's Answer Ex. 1, pt. 2, at 69; Parole Hr'g Tr. 59.

1          5.   Lack of Parole Plans

2          Fifth, the Superior Court properly affirmed the Board's determination that Petitioner had

3    inadequate parole plans.  *See* Resp't's Answer Ex. 3, at 5.  Petitioner participated in the Coastline

4    Community College Program.  Resp't's Answer Ex. 1, pt. 2, at 22; Parole Hr'g Tr. 32.  In total,

5    Petitioner "probably ha[d] about 36 units."  Resp't's Answer Ex. 1, pt. 2, at 22; Parole Hr'g Tr.

6    32.

7          Petitioner was a "culinary janitor" until April 6, 2007, when "he was assigned to the Plant

8    Operation Engineering Shop."  Resp't's Answer Ex. 1, pt. 2, at 24; Parole Hr'g Tr. 34.  At the

9    plant, "[h]e earned a combination of satisfactory, below average, and unsatisfactory grades.

10   Resp't's Answer Ex. 1, pt. 2, at 24; Parole Hr'g Tr. 34.  In December 2007, Petitioner was

11   "assigned as an [i]nfirmary janitor."  Resp't's Answer Ex. 1, pt. 2, at 24; Parole Hr'g Tr. 34.  As

12   an infirmary janitor, "[h]e earned exceptional grades."  Resp't's Answer Ex. 1, pt. 2, at 24;

13   Parole Hr'g Tr. 34.

14         At the hearing, Petitioner tried to explain the deviation in work reviews.  According to

15   Petitioner, one report was unsatisfactory because he had "a confrontation with an inmate that a

16   supervisor interceded on."  Resp't's Answer Ex. 1, pt. 2, at 25; Parole Hr'g Tr. 35.  Petitioner

17   said "something to [the supervisor] that she didn't like and then that's when everything just went

18   downhill from there," resulting in the January 2007 115 violation.  Resp't's Answer Ex. 1, pt. 2,

19   at 25; Parole Hr'g Tr. 35; *see supra* Part VI.B.3.  Next, at Petitioner's culinary job, he "was

20   bored" because "[i]t wasn't much work. . . . You know, it was one of them jobs."  Resp't's

21   Answer Ex. 1, pt. 2, at 25-26; Parole Hr'g Tr. 35-36.  Then, at the "Plant Ops," Petitioner had

22   "seven or eight supervisors and each one was requesting [him] to do something at different times

23   and sometimes their requests would conflict.  So, it was a situation that [Petitioner] didn't like

24   being in."  Resp't's Answer Ex. 1, pt. 2, at 26; Parole Hr'g Tr. 36.  Petitioner believed "that was

25   reflected in . . . [h]is grades there" because he "made it known that . . . [he] wanted to move on."

26   Resp't's Answer Ex. 1, pt. 2, at 26; Parole Hr'g Tr. 36.

1    Petitioner also admitted:

2        After I got the 115 I kind of like got discouraged from even
         attempting to put together a parole plan.  My previous plan was to
3        try to go to a half-way house or some type of Delancey Street or
         something like that to slowly enter myself back into the
4        community, work my way back in.  And that was basically it.  To
         attend some type of NA program out there . . . . Not long after I
5        came from the Board that 115 . . . happened and it just took a lot
         out of me.  So, I don't have parole plans.

6

7    Resp't's Answer Ex. 1, pt. 2, at 38; Parole Hr'g Tr. 48.  When the Board asked if Petitioner made

8    any attempts to contact Delancey Street, Petitioner responded, "I didn't even try to fool myself

9    into thinking that that was a possibility."  Resp't's Answer Ex. 1, pt. 2, at 38-39; Parole Hr'g Tr.

10   48-49.  Thus, the Board properly determined Petitioner lacked parole plans, and the Superior

11   Court reasonably affirmed this.

12       In sum, the Superior Court reasonably concluded that "the circumstances of the

13   commitment offense, when considered in light of Petitioner's prior criminal and social history,

14   his institutional disciplinary record, his psychological assessment, which indicates a lack of

15   insight, and lack of parole plans, continue to be predictive of current dangerousness."  *See*

16   Resp't's Answer Ex. 3, at 5.  These factors demonstrate a nexus between the facts in the record

17   regarding Petitioner's commitment offense and the ultimate conclusion that Petitioner still posed

18   a risk of danger or threat to the public.  These factors also independently demonstrate some

19   evidence in the record that Petitioner was not suitable for parole.  The Superior Court properly

20   concluded that the Board's decision withstands the minimally stringent "some evidence" test and

21   has not violated Petitioner's right to due process of law.

22                              VII.  CONCLUSION

23   For the foregoing reasons, IT IS HEREBY ORDERED that:

24       1.  Petitioner's request for an order to show cause is DENIED as moot;

25       2.  Petitioner's request for appointment of counsel is DENIED; and

26       3.  Petitioner's request for an evidentiary hearing is DENIED.

1    IT IS HEREBY RECOMMENDED that Petitioner's application for writ of habeas corpus

2  be DENIED.

3    These findings and recommendations are submitted to the United States District Judge

4  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one

5  days after being served with these findings and recommendations, any party may file written

6  objections with the court and serve a copy on all parties.  Such a document should be captioned

7  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

8  shall be served and filed within seven days after service of the objections.  Failure to file

9  objections within the specified time may waive the right to appeal the District Court's order.

10  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57

11  (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of

12  appealability should be issued in the event he elects to file an appeal from the judgment in this

13  case.  *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or

14  deny certificate of appealability when it enters final order adverse to applicant).

18  DATED:       October 28, 2010.

21                                      TIMOTHY J BOMMER
                                        UNITED STATES MAGISTRATE JUDGE